**DOW JONES COMPANY, INC. and John R. Emshwiller, Plaintiffs,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Defendant.**

**No. CV 01–07074 CAS.**

United States District Court,
C.D. California,
Western Division.

Sept. 16, 2003.

Theodore J. Boutrous, Jr., Sonja Rebecca West, Gibson Dunn & Crutcher, Los Angeles, CA, for Plaintiffs.

Gillian Flory, Marcia N. Tiersky, Washington, DC, for Defendant.

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFFS' CROSS–MOTION FOR SUMMARY JUDGMENT

SNYDER, District Judge.

## I. INTRODUCTION

On August 14, 2001, plaintiffs Dow Jones & Company, Inc. and John R. Emshwiller (collectively, "plaintiffs") initiated this action pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking disclosure of a document relating to the investigation conducted by defendant Federal Energy Regulatory Commission ("FERC") of energy production and sales at two California power plants. Plaintiffs allege a single claim for declaratory and injunctive relief. On March 11, 2002, defendant filed a motion for summary judgment, and on April 11, 2002, plaintiffs filed a cross-motion for summary judgment.[1] The parties appeared before the Court on June 10, 2002 on both motions. On June 24, 2002, defendant filed additional documentation in support of its motion, and on June 28, 2002, plaintiffs filed a response to defendant's additional submission. The Court thereafter took the matter under submission, and now finds and concludes as follows.

## II. BACKGROUND

Dow Jones & Company, Inc. is the publisher of *The Wall Street Journal,* a financial and business newspaper; Emshwiller is the newspaper's Senior National Correspondent and has been covering the electricity crisis in California. Complaint ("Comp.") ¶ 3. FERC is an independent regulatory agency within the United States Department of Energy responsible for, *inter alia,* regulating the transmission and wholesale sales of electricity in interstate commerce. *Id.* ¶ 4. FERC is empowered to subpoena witnesses and documents, conduct investigations, and to impose penalties on behalf of the federal government based on alleged wrongdoing by regulated entities. *Id.*

On an unspecified date, the California Independent System Operator ("ISO") referred to FERC circumstances relating to the operation of two "reliability must-run" generation units ("RMR units")[2] owned by AES South-

---

1. On May 8, 2002, defendant filed a single responsive brief intended to serve as its reply to plaintiffs' opposition to defendant's motion for summary judgment and its opposition to plaintiffs' cross-motion for summary judgment. On May 23, 2002, plaintiffs filed a reply in support of their cross-motion for summary judgment. This matter may be appropriately decided on cross-motions for summary judgment. *Miscavige v. I.R.S.,* 2 F.3d 366, 369 (11th Cir.1993).

2. A RMR unit is "a generating facility that the ISO can call upon when necessary to provide

land, Inc. and some of its subsidiaries (collectively, "AES") and whose power is sold by Williams Energy Market & Trading Co. ("Williams").[3] Defendant's Statement of Uncontroverted Facts ("DSUF") ¶ 1. The power plants at issue are located in Alamitos and Huntington Beach, California. Plaintiffs' Statement of Uncontroverted Facts ("PSUF") ¶ 1.

Subsequently, on an unspecified date, FERC initiated a preliminary nonpublic investigation pursuant to 18 C.F.R. § 1b.1 *et seq.* DSUF ¶ 2. On March 14, 2001, FERC issued a Show Cause Order to AES and Williams based on its investigation. The Show Cause Order states that from April 25, 2000, through May 11, 2000, AES and Williams agreed that the units designated as RMR units would not be available for service when dispatched by the ISO. PSUF ¶ 3; Show Cause Order at 1. This unavailability caused the ISO to dispatch other units, also owned by AES and whose electricity is sold by Williams, at prices higher than the applicable RMR contract price or the then-prevailing market price. *Id.* ¶ 3; Show Cause Order at 1. On those occasions, Williams was paid a bid price near or at the $750 per megawatt hour maximum, even though the estimated average cost of non-RMR units during those dates was $63 per megawatt hour. *Id.* ¶¶ 4, 5; Show Cause Order at 10.

The Show Cause Order states that information contained in the attached nonpublic appendix (the "appendix") "raises serious questions" about whether AES and Williams coordinated the timing and length of the outages or violated contracts and tariffs on file with FERC, as well as whether AES failed to maintain the RMR units according to FERC standards. PSUF ¶ 7; Show Cause Order at 10–11. The Show Cause Order states that the appendix contains specific information which "indicates that

Williams and AES may have acted together to exercise locational market power" with respect to the two RMR units. PSUF ¶ 6; Show Cause Order at 12. In the Show Cause Order, FERC directs AES and Williams to explain why it should not require either or both companies to refund to the ISO $10,857,775 in additional payments made to them by the ISO during the outages. PSUF ¶ 8; Show Cause Order at 10.

The appendix is a ten-page document with six pages of attachments, and is based on interviews and investigation conducted by FERC employees. DSUF ¶ 4. It contains the names of individuals who were questioned or mentioned in the investigation. *Id.* In the Show Cause Order, FERC states that it "will make the non-public Appendix public five days after the date of this order, unless Williams or AES provides a justification to the Commission for continued confidentiality."[4] Show Cause Order at 12. A copy of the appendix was provided to unspecified individuals at Williams and AES on March 14, 2001, the same day the Show Cause Order was issued. Wolfman Dec. ¶ 34 and Defendant's Motion for Summary Judgment ("Defendant's Mot.") at 12, fn. 3.

On April 30, 2001, FERC issued an "Order Approving Stipulation and Consent Agreement," *see* Plaintiffs' Mot., Ex. B, stating that it approved a settlement agreement between FERC's Market Oversight and Enforcement Section and AES and Williams "with respect to all issues raised in the show cause order." Order Approving Stipulation and Consent Agreement at 1. The Stipulation and Consent Agreement ("Settlement Agreement") (which is a separate document from the order approving it) states that it is a "full and complete settlement of all administrative or civil claims" FERC has against Williams or AES and "any of their officers, directors,

---

energy and ancillary service essential to the reliability of the California transmission network." Show Cause Order at 2 (Plaintiffs' Mot., Ex. A and Defendant's Mot., Ex. A). The ISO pays an RMR owner or agent a fixed payment to compensate for the RMR unit's availability, and a second, variable payment to compensate for the RMR unit's output at cost-based rates if the unit is not otherwise participating in the market. *Id.*

3. Williams is a wholesale seller of electric energy in California which markets the power from the two AES plants on an exclusive basis. PSUF ¶ 1.

4. In addition, the Show Cause Order states that "Part or all of [the information contained in the appendix] may be subject to requests for confidential treatment by Williams and AES." Show Cause Order at 12.

or employees either before [FERC] or the courts, relating to events that occurred relative to the operation of Alamitos 4 and Huntington Beach 2 [the two RMR units] from April 25, 2000 through May 11, 2000, including all matters raised in the March 14, 2001 Show Cause Order." Settlement Agreement at 7–8 (Plaintiffs' Mot., Ex. C and Defendant's Mot., Ex. B). In the Settlement Agreement, Williams agreed to refund $8 million to the ISO. *Id.* at 7.

The Settlement Agreement provides that FERC will not release the appendix without order of a court. Settlement Agreement at 8. In the Order Approving Stipulation and Consent Agreement, FERC states

> the [appendix] contains the type of information that is exempt from public disclosure. Public disclosure of the [appendix] could interfere with continued enforcement proceedings with respect to bulk power markets in California, and could have other adverse consequences as well. The information in the [appendix] satisfies the criteria in FOIA ... for public nondisclosure. Accordingly, the Commission will not make public the [appendix] pursuant to section 1.b.9(a) of its regulations without an order of a court.

Order Approving Stipulation and Consent Agreement at 4. In the Order Approving Stipulation and Consent Agreement, FERC states that the appendix is exempt from public disclosure under FOIA Exemptions 7(A), (B) and (C) 5 U.S.C. §§ 552(b)(7)(A)(C). *Id.* at 3, fn. 4.

In addition, the Order Approving. Stipulation and Consent Agreement states that the Public Utilities Commission of the State of California ("CPUC") filed a notice of intervention in the proceeding and asserted that "refunds for abuse of market power should include a penalty, above the amount of refund, to deter abusive behavior by market participants." Order Approving Stipulation and Consent Agreement at 5. On April 30, 2001, FERC Commissioner William Massey filed a statement that he "agree[s] with the comments of the California PUC on this issue" and that "the settlement is not as strong as I would have preferred." PSUF ¶ 18; *see* Plaintiffs' Mot., Ex. D.

In a letter dated May 9, 2001, Emshwiller, in his capacity as a journalist for *The Wall Street Journal,* made a request pursuant to FOIA that FERC provide him with a copy of "the [a]ppendix and any attendant documents." May 9, 2001 Emshwiller Letter (Plaintiffs' Mot., Ex. E and Defendant's Mot., Ex. D). In a May 21, 2001 letter, FERC denied Emshwiller's request, stating that FERC had agreed not to release the appendix without a court order and that the appendix is exempt from disclosure under FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), as "release of the appendix would interfere with an ongoing enforcement proceedings involving the California bulk power market, as well as possibly having other adverse consequences." May 21, 2001 FERC letter (Plaintiffs' Mot., Ex. F and Defendant's Mot., Ex. E). On June 7, 2001, plaintiffs appealed FERC's denial of disclosure of the appendix to the General Counsel of FERC and again requested a copy of the appendix or, alternatively, that "any non-exempt portions of the document be released in [redacted form]." June 7, 2001 Boutrous Letter at 2 (Plaintiffs' Mot., Ex. G and Defendant's Mot., Ex. F). On July 17, 2001, FERC denied plaintiffs' appeal and refused to disclose any part of the appendix. July 17, 2001 FERC letter at 1 (Plaintiffs' Mot., Ex. H and Defendant's Mot., Ex. G). In that letter, the General Counsel of FERC states that the appendix is exempt from disclosure pursuant to Exemption 4, and Exemptions 7(A), (B), and (C) of FOIA, 5 U.S.C. 552(b)(4), (7)(A)–(C). *See* July 17, 2001 FERC Letter at 2–6. Plaintiffs then initiated the instant suit.

Pursuant to the Court's request, on June 24, 2002, defendant submitted a *Vaughn* index [5] describing the contents of the appendix under seal, as well as a copy of the appendix under seal and *in camera.*

---

**5.** A *Vaughn* index "usually consists of a detailed affidavit, the purpose of which is to permit the court system effectively and efficiently to evaluate the factual nature of disputed information [in a FOIA case]." *John Doe Agency·v. John Doe Corp.,* 493 U.S. 146, 149 fn. 2, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989).

## III. STANDARD FOR SUMMARY JUDGMENT

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). The Supreme Court has held that FOIA is "broadly conceived" and that "its 'basic policy' is in favor of disclosure." *Id.* at 220, 98 S.Ct. 2311 (citation omitted). FOIA requires disclosure unless the agency can prove that the requested document falls into one of the statute's exceptions. *Department of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976).

In suits under FOIA, the defendant governmental agency bears the burden of justifying its withholding of responsive documents. *Church of Scientology of California v. U.S. Dept. of Army*, 611 F.2d 738, 742 (9th Cir.1979). The agency's "burden cannot be met by mere conclusory statements; the agency must show how release of the particular material would have the adverse consequence that the Act seeks to guard against." *Washington Post Co. v. U.S. Dept. of Justice*, 863 F.2d 96, 101 (D.C.Cir.1988).

Once the document in question is identified, FOIA actions are generally resolved on a motion for summary judgment. *Miscavige v. I.R.S.*, 2 F.3d 366, 369 (11th Cir.1993) ("FOIA cases should be handled on motions for summary judgment"); *see also Church of Scientology Intern. v. I.R.S*, 845 F.Supp. 714, 718 (C.D.Cal.1993) ("The agency's burden may be sustained by submitting affidavits which provide a detailed analysis of the requested documents and the reasons for invoking the exemption. Summary judgment may be granted solely on the basis of these agency affidavits if they are clear, specific, and reasonably detailed, and describe the withheld information in a factual and nonconclusory manner."). A district court deciding a FOIA claim reviews the agency's claim of exemption *de novo.* 5 U.S.C. § 552(a)(4)(B).

## IV. DISCUSSION

### A. *FOIA Exemption 7(A)*

■ Defendant contends that the appendix is protected by Exemption 7(A), which allows an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). In order to claim protection under Exemption 7(A), FERC "must establish that it is a law enforcement agency, that the withheld documents were investigatory records compiled for law enforcement purposes, and that disclosure of those documents would interfere with pending enforcement proceedings." *Lewis v. I.R.S.*, 823 F.2d 375, 379 (9th Cir.1987).

The parties agree that FERC is a law enforcement agency, and that the appendix was compiled for law enforcement purposes. Defendant's Mot. at 10; Plaintiffs' Reply in Support of Cross–Motion for Summary Judgment ("Plaintiffs' Reply") at 13. Defendant contends that it meets the third requirement set forth in *Lewis,* in that disclosure of the appendix would interfere with pending law enforcement proceedings. Defendant's Mot. at 10–11. Defendant states that it "has an ongoing, formal, non-public investigation of other potential violations arising out of the conduct of Williams and AES with respect to the operation, maintenance, and sale of power from the Alamitos and Huntington Beach plants in 2000 and 2001." Wolfman Dec. ¶ 31. Defendant further contends that the California Attorney General's Office is undertaking a criminal investigation into whether Williams and AES defrauded the ISO by falsely claiming that certain RMR units were unavailable during the period from April 25, 2000 through May 11, 2000. *See* Wolfman Dec., Ex. 1, at 2 (FOIA request from California Attorney General describing its criminal investigation and seeking disclosure of the appendix). Defendant argues that if the appendix is disclosed, these enforcement actions could be compromised by (1) diminishing Williams' and AES's willingness to cooperate with FERC in its current investigation; (2) disclosing the government's

litigation strategy; and (3) revealing the identities of certain witnesses. Defendant's Mot. at 11–12.

In response, plaintiffs argue that Exemption 7(A) "cannot justify withholding unless the material withheld relates to a concrete prospective law enforcement proceeding," *Carson v. U.S. Dept. of Justice*, 631 F.2d 1008, 1018 (D.C.Cir.1980) (citations omitted), and thus does not apply to the instant case because the Settlement Agreement states that it is a "full and complete settlement of all administrative or civil claims" defendant has or may have had against AES and Williams relating to all matters raised in the Show Cause Order. Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Mot.") at 13–14. In addition, plaintiffs contend that in order to establish that disclosure of the appendix would interfere with law enforcement proceedings, defendant must be specific as to what information is being withheld and the distinct harm that could result from its disclosure. *Id.* at 14; *see Miller v. U.S. Dept. of Agriculture*, 13 F.3d 260, 263 (8th Cir.1993) (rejecting government's argument for nondisclosure on basis of interference with enforcement proceedings because government's affidavits were "of the boilerplate, conclusory variety"). Plaintiffs argue that in the instant case, defendant has made a purely conclusory assertion that release of the appendix would disclose the government's litigation strategy and reveal the identities of certain witnesses. Plaintiffs further notes that defendant has submitted no affidavits or other concrete proof detailing the specific harm to law enforcement actions that would result from disclosure of the appendix. Plaintiffs' Mot. at 15.

In addition, plaintiffs contend that defendant's argument for nondisclosure is undermined by the fact that Williams and AES were provided with copies of the appendix. *Id.* at 15. Plaintiffs argue that because the logic behind exempting documents from disclosure under 7(A) is to prevent revealing to the subjects of the investigation either the government's litigation strategy or the identities of employee-witnesses, *see Wright v. OSHA*, 822 F.2d 642, 645–47 (7th Cir.1987), neither rationale could apply because both parties have copies of the appendix. Plaintiffs' Mot. at 15; *see Scheer v. U.S. Dept. of Justice*, 35 F.Supp.2d 9, 14 (D.D.C.1999) (denying agency's request for nondisclosure pursuant to Exemption 7(A) as "[i]f the [agency] was truly concerned that harm would result from [the investigated party] potentially learning the scope, direction and nature of [its] investigation through disclosure to [plaintiff], then it would not have directly disclosed the report to [the investigated party] prior to the official close of the investigation."). Finally, plaintiffs argue that defendant's statement regarding the ongoing criminal investigation by the California Attorney General is irrelevant. Plaintiffs' Mot. at 16. While Exemption 7(A) is designed "to prevent premature disclosure of investigatory materials which might be used in a law enforcement action," *F.B.I. v. Abramson*, 456 U.S. 615, 621, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982), in this case it is the subjects of the investigation who have copies of the appendix, while the investigating party, the California Attorney General, does not.[6]

In response to plaintiffs' argument, defendant contends that the scope of the Settlement Agreement is limited to Williams' and AES' conduct between April 25, 2000, and May 11, 2000, and does not address either criminal investigations or civil investigations outside of that time frame. Defendant states that the release of the appendix could undermine FERC's ability to obtain cooperation from Williams and AES in its ongoing investigation, and potentially hamper settlement discussions. Defendant's Reply at 5–6; Wolfman Dec. ¶ 35.

■ The Court finds defendant's argument unpersuasive. "[M]aterial cannot be and ought not be exempt [from disclosure] merely because it can be categorized as an

---

6. At the time defendant filed its motion for summary judgment in this case, there was pending in United States District Court for the Northern District of California a FOIA suit brought by the California Attorney General seeking disclosure of records related to FERC's investigation of AES and Williams, including the appendix. However, the California Attorney General no longer seeks disclosure of the appendix. Saltiel Dec. ¶ 5 (Defendant's Supplemental Submissions, Ex. B).

investigatory file compiled for law enforcement purposes." *Robbins,* 437 U.S. at 227, 98 S.Ct. 2311. Rather, an agency seeking exemption pursuant to 7(A) must demonstrate that disclosure would interfere with a "concrete prospective law enforcement proceeding." *National Sec. Archive v. F.B.I.,* 759 F.Supp. 872, 883 (D.D.C.1991) (citations omitted). In this case, defendant has failed to describe how disclosure of the appendix could compromise its own investigation or the investigation by the California Attorney General. From the Court's own review of the appendix, it does not appear that disclosure to a third party would undermine either investigation, especially in light of the fact that each target company has a copy of the appendix and is therefore on notice as to the government's possible litigation strategy and potential witnesses. Moreover, there is no claim by the California Attorney General that disclosure will interfere with any investigation being conducted by the State of California. Finally, defendant fails to cite, and the Court was unable to locate, any case in which a court upheld an agency's determination to withhold disclosure pursuant to Exemption 7(A) because disclosure would interfere with settlement discussions or impede the willingness of targets of the investigation to voluntarily disclose additional information voluntarily.[7] From its language, it is clear that Exemption 7(A) is aimed at preventing disclosure which would compromise an ongoing investigation; because defendant has failed to submit evidence that disclosure of the appendix would do so, the Court finds that defendant has failed to demonstrate that withholding the appendix under Exemption 7(A) is appropriate.

### B. *FOIA Exemption 7(B)*

■ Exemption 7(B) exempts from disclosure "records or information compiled for law enforcement purposes" to the extent that production "would deprive a person of a right to a fair trial or an impartial adjudication." 5 U.S.C. § 552(b)(7)(B). To invoke Exemption 7(B), the government bears the burden of showing (1) that a trial or adjudication is pending or truly imminent and (2) that it is more probable than not that disclosure of the material sought would seriously interfere with the fairness of those proceedings. *Washington Post,* 863 F.2d at 102 (D.C.Cir. 1988).

■ Defendant contends that there are pending enforcement proceedings by it and by the California Attorney General, and that release of the appendix "would produce pretrial publicity that could deprive the defendants of a fair trial." Defendant's Mot. at 13; Wolfman Dec. ¶¶ 36–37; *see also* Supplemental Wolfman Dec.[8] ¶ 6 ("Release of the document at this point would essentially punish AES and Williams for settling with FERC, because they settled the informal investigation before they could avail themselves of a public forum in which to refute or address the allegations in the [ ] appendix. Consequently, what would be released is a version of the events that transpired in which AES and Williams' point of view would not be available."). In addition, defendant argues that because individuals interviewed in the investigation were not under oath or given *Miranda* warnings prior to their interviews, Wolfman Dec. ¶ 19, the release of the appendix would significantly prejudice these individuals should criminal, civil, or administrative actions be taken against them. Defendant's Mot. at 13.

In response, plaintiffs argue that defendant has failed to fulfill either prong of the *Washington Post* test, and that withholding the appendix pursuant to Exemption 7(B) is thus inappropriate. Plaintiffs' Mot. at 18.

---

**7.** In addition, plaintiffs contend that defendant has failed to cite any case where information was found to be exempt under 7(A) once the target of investigation has access to it. Plaintiffs' Reply at 14. In *Campbell v. Dept. of Health,* 682 F.2d 256 (D.C.Cir.1982), cited by defendant for the proposition that disclosure of the document to the targets of the investigation does not vitiate Exemption 7(A), *see* Defendant's Reply at 6, the Court of Appeals merely remanded the case to the district court for further proceedings on the question of whether the investigation would be harmed by release of information provided by the target of the investigation to a third party.

**8.** On June 24, 2002, along with the *Vaughn* index and appendix, defendant filed additional submissions in support of its motion for summary judgment, including an supplemental declaration by Wolfman.

First, plaintiffs contend that defendant has not demonstrated that either FERC's continued investigation or the investigation by the California Attorney General constitutes a "trial or adjudication" that is "pending or truly imminent." *See, e.g., Playboy Enterprises, Inc. v. U.S. Dept. of Justice,* 516 F.Supp. 233, 246 (D.D.C.1981) (rejecting argument for nondisclosure pursuant to Exemption 7(B) on the grounds that no trial or adjudication was pending). In addition, plaintiffs argue that defendant has not demonstrated that disclosure of the appendix would seriously interfere with the fairness of any proceeding. Plaintiffs' Mot. at 18; *see also, e.g., Playboy Enterprises,* 516 F.Supp. at 246 (noting that "the degree of publicity that might come about as a result of the disclosure of the [document] is speculative at best.").

The Court finds that defendant has submitted no evidence that any trial or adjudication regarding Williams or AES is "pending or truly imminent." In addition, defendant has failed to demonstrate that disclosure of the appendix would generate pretrial publicity that could deprive the companies or any of their employees of their right to a fair trial. Thus, the Court finds that defendant has failed to meet its burden under Exemption 7(B).

### C. *FOIA Exemption 7(C)*

■ Defendant argues that the appendix is exempt from disclosure under Exemption 7(C), which allows an agency to withhold documents which "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Defendant's Mot. at 14. The parties agree that in assessing whether 7(C) applies to the instant case, the Court "must determine whether the public interest in disclosure outweighs the individual privacy interests that would suffer from disclosure." *Church of Scientology Intern. v. I.R.S.,* 995 F.2d 916, 920 (9th Cir.1993).

■ Defendant contends that release of the appendix could constitute an invasion of personal privacy because it contains references to various individuals involved in Williams' and AES' dealings with respect to the time period and generation units in question, including individuals who voluntarily cooperated with defendant's investigation. Wolfman Dec. ¶¶ 39, 40. Defendant contends that such individuals are "precisely the sort that Exemption 7(C) is designed to protect." Defendant's Mot. at 15 (citing, *inter alia, Computer Professionals for Social Responsibility v. U.S. Secret Service,* 72 F.3d 897, 904 (D.C.Cir.1996)) ("[Exemption 7(C)'s interest in protecting privacy] extends to persons who are not the subjects of the investigation but who may nonetheless have their privacy invaded by having their identities and information about them revealed in connection with the investigation."). With regard to the public interest in disclosure, defendant argues that disclosing the appendix would "not materially advance the public interest in opening agency action to public scrutiny [because] [t]here is no allegation that FERC has acted inappropriately." Defendant's Mot. at 15. Defendant contends that instead, plaintiffs seek the appendix "for what it would reveal about the target of the investigation." *Id.*

In response, plaintiffs argue that the public interest in the disclosure of the appendix clearly outweighs the privacy interests of the individuals involved. Plaintiffs' Mot. at 19–20. First, plaintiffs contend that "information which sheds light on the propriety of [the agency's] handling of the [investigation] raises a cognizable public interest under the FOIA." *Lissner v. U.S. Customs Service,* 241 F.3d 1220, 1223 (9th Cir.2001). Furthermore, plaintiffs argue that the appendix will reveal information about the activities of Williams and AES, which they describe as "intensely regulated entities in an intensely public business," as well as the regulatory activities of defendant. Plaintiffs' Mot. at 20. In addition, plaintiffs state that they seek information about defendant's "unexplained decision" to settle with Williams and AES for $8 million, almost $3 million less than the amount it stated was the total refund due by Williams. *Id.* Finally, plaintiffs dispute defendant's contention that releasing the appendix would invade the privacy of the individuals named therein: "The disclosures with which the statute is concerned are those of

'an intimate personal nature' such as marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcoholic consumption, family fights, and reputation.... [while] [i]nformation relating to business judgments and relationships does not qualify for exemption." *Washington Post*, 863 F.2d at 100 (citations omitted).

The Court finds that the public interest in disclosure outweighs any privacy interests that might suffer from disclosure of the appendix. The appendix does not accuse individuals of any criminal activity or otherwise intrude on their privacy in a way prohibited by *Washington Post.* The public clearly has a great interest in disclosure of information relevant to the California power crisis, and as such disclosure "is in complete conformity with the statutory purpose that the public know what its government is up to." *Favish v. Office of Indep. Counsel*, 217 F.3d 1168, 1172 (9th Cir.2000). Therefore, the finds that defendant has failed to meet its burden under Exemption 7(C).

### D. *FOIA Exemption 4*

Defendant argues that the appendix is protected by Exemption 4, 5 U.S.C. § 552(b)(4), which provides that "trade secrets and commercial or financial information obtained from a person and privileged or confidential" are exempt from disclosure. Defendant's Mot. at 6. Defendant argues that the appendix fulfills the criteria of Exemption 4, in that it contains (1) commercial and financial information (2) obtained from a person or by the government (3) that is privileged or confidential. *See GC Micro Corp. v. Defense Logistics Agency,* 33 F.3d 1109, 1112 (9th Cir. 1994).

Defendant contends that the information provided during the investigation is commercial and financial, as it "relates to business decisions and practices regarding the sale of power, and the operation and maintenance of the generation units.... Some of the information also relates to revenues associated with the decision to shut down generation

units." Wolfman Dec. ¶ 18; Supplemental Wolfman Dec. ¶ 9. In response, plaintiffs argue that based on defendant's description of the contents of the appendix, defendant has failed establish that the appendix contains commercial or financial information. Plaintiffs' Reply at 4. The Court notes that "the terms 'commercial' and 'financial' in the exemption should be given their ordinary meanings." *Public Citizen Health Research Group v. Food and Drug Admin.*, 704 F.2d 1280, 1290 (D.C.Cir.1983). The Court's review of the *Vaughn* index and appendix submitted by defendant reveals that the information in the appendix is largely commercial and financial in nature.

Next, defendant states that the information was provided by a person. "The term 'person' as used in Exemption 4 refers to a wide range of entities including corporations, associations and public or private organizations other than agencies." *Gilmore v. U.S. Dept. of Energy,* 4 F.Supp.2d 912, 922 (N.D.Cal.1998). The appendix contains information obtained by FERC staff from Williams and AES and their employees or representatives. Wolfman Dec. ¶ 19. Plaintiffs do not appear to dispute that defendant has established this element.[9]

Finally, defendant contends that the contents of the appendix are confidential, whether the Court applies the test for confidentiality set forth in *Critical Mass Energy Project v. Nuclear Regulatory Comm.*, 975 F.2d 871, 874 (D.C.Cir.1992), or the test set forth in *National Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 766–67 (D.C.Cir.1974). Defendant's Mot. at 7–9.

█ In *National Parks*, the Court of Appeals for the District of Columbia Circuit analyzed the meaning of "confidential" in an Exemption 4 context and determined that "commercial or financial matter is 'confidential' for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause

---

9. Although plaintiffs state that based on the description of the appendix provided by defendant, *see* Wolfman Dec. ¶ 10, some of the appendix appears to be internal agency work product and thus not "obtained from a person," Plaintiffs' Reply at 4, they do not expand on that argument.

substantial harm to the competitive position of the person from whom the information was obtained." *National Parks*, 498 F.2d at 770. The test for confidentiality set forth in *National Parks* was subsequently adopted by nearly all of the other circuits, including the Ninth Circuit. *See, e.g., Frazee v. United States Forest Serv.*, 97 F.3d 367, 371 (9th Cir.1996); *G.C. Micro Corp.*, 33 F.3d at 1112–13.

■ Eighteen years later, in *Critical Mass*, the Court of Appeals for the District of Columbia Circuit for the first time drew a distinction between information that was voluntarily provided to an agency and information that was provided pursuant to an agency mandate. *Critical Mass*, 975 F.2d at 878. The *Critical Mass* court reaffirmed the *National Parks* test for determining the confidentiality of information submitted under compulsion, but established a different test for information submitted voluntarily: "financial or commercial information provided to the Government on a voluntary basis is 'confidential' for the purpose of Exemption 4 *if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." Id.* at 879.

While the parties agree that the Ninth Circuit has not yet addressed the distinction made in *Critical Mass* between information that was compelled and that was provided voluntarily, they disagree as to which test should be applied in this case.[10] Defendant argues that the Court should apply the *Critical Mass* test to determine whether the appendix is confidential, and plaintiffs assert that the Court should apply the stricter standard required by *National Parks*. Defendant's Mot. at 9; Plaintiffs' Mot. at 7.

The Court finds that it is appropriate to apply the test set forth in *National Parks* rather than the test set forth in *Critical Mass* to determine whether the appendix is confidential as defined by Exemption 4. First, Ninth Circuit jurisprudence regarding FOIA relies on *National Parks* even after the Court of Appeals for the District of Columbia Circuit decided *Critical Mass* in 1992. *See, e.g., GC Micro Corp.*, 33 F.3d at 1112–13; *see also, e.g., Frazee*, 97 F.3d at 370 (describing *National Parks* as "the leading case on Exemption 4" and stating that "[the Ninth Circuit] adopted [the *National Parks*] test in *GC Micro*"). Furthermore, the Court of Appeals for the District of Columbia Circuit heard Critical Mass *en banc* and decided the case in a sharply divided 7–4 opinion. In a strong dissent, then-Circuit Judge Ruth Bader Ginsburg noted:

> The surgery done on *National Parks* might have been less questionable had that decision fundamentally misunderstood the legislative will or generated disagreement among the circuits. But the court forthrightly acknowledges that no such flaw marred *National Parks. See* maj. op. at 876–77. Thus the court's new exemption 4 test, devised for voluntary submissions, is all the more difficult to reconcile with Congress' unmistakably clear direction: 'The mandate of the FOIA calls for broad disclosure of Government records,' and 'for this reason … FOIA exemptions are to be narrowly construed.'

*Critical Mass*, 975 F.2d at 884 (Ginsburg, Ruth B., J., dissenting) (citations and internal quotations omitted). Judge Ginsburg further noted that "[u]nder the regime replacing National Parks, the exemption will expand beyond what Congress intended… The National Parks formulation fits the congressional design better than the virtual abandonment of federal court scrutiny approved by the court today for Government withholding of commercial or financial mate-

---

**10.** It should be noted that Wolfman states that the information contained in the appendix was submitted in the course of a preliminary investigation and that under FERC rules, "no process is issued or testimony compelled" in preliminary investigations. Wolfman Dec. ¶ 20 (citing 18 C.F.R. § 1b.6). In addition, Wolfman states that "[FERC] staff did not compel the companies to provide this information; the information was provided voluntarily to the [FERC]." However, in her supplemental declaration, Wolfman states that "Williams submitted a portion of this information voluntarily, and AES provided its information voluntarily." Supplemental Wolfman Dec. ¶ 2; *see also id.* Wolfman Dec. ¶ 9 ("Much of the information in the [ ] appendix was voluntarily provided by Williams and AES."). Thus, it remains unclear what information in the appendix, if any, was in fact compelled to be disclosed to FERC.

rials submitted voluntarily." *Id.* at 885–86 (citations and internal quotations omitted).

Although defendant urges this Court to adopt *Critical Mass,* the Court believes that the holding therein is not consistent with Ninth Circuit jurisprudence, nor with the purposes of Congress in enacting FOIA, which mandates the courts to favor disclosure to serve the public interest. The Court also notes that the test set forth in *Critical Mass* has not been adopted by any Circuit other than the District of Columbia Circuit and has been the subject of criticism by some courts. *See, e.g., Comdisco, Inc. v. General Services Administration,* 864 F.Supp. 510, 518 (E.D.Va.1994) ("the first prong of the *National Parks* test already largely incorporates the voluntary/mandatory distinction urged in *Critical Mass,* and in so doing, properly accommodates the governmental interest in ensuring continued access to desired information"); *but see Environmental Technology, Inc. v. Environmental Protection Agency,* 822 F.Supp. 1226, 1229 (E.D.Va. 1993) ("As this Court finds the D.C. Circuit's reasoning in Critical Mass to be persuasive, it will employ that court's distinction between information voluntarily provided to the government and information provided pursuant to an obligation").

Therefore, the Court applies the test set forth in *National Parks* to defendant's claim that the appendix is not disclosable under Exemption 4. Defendant contends that the appendix is confidential under the first prong of the *National Parks* test, as disclosure of the information would impair the government's ability to obtain information in the future. Defendant's Mot. at 8–9; Defendant's Reply at 4–5. Defendant argues that disclosure "would implicate the government's ability to obtain similar information in the future.... [F]act-finding is facilitated by the expectation of confidentiality [and as such] [d]isclosure of the [appendix] would undermine this expectation and impede future fact-gathering." Defendant's Mot. at 9; Wolfman Dec. ¶¶ 23, 24, 35; *see also* Wolfman Dec. ¶ 28 ("[I]f entities who voluntarily cooperate with the [FERC] in investigations believe that courts will not afford such submissions voluntary treatment, these entities will be less likely to voluntarily provide information to [FERC] in the future").

In response, plaintiffs contend that defendant's "conclusory statements [that the appendix is confidential under the first prong of the *National Parks* test] are easily disproved by FERC's own threat to Williams and AES that it was prepared to publicly disclose the information...." Plaintiffs' Mot. at 10. Plaintiffs note that defendant stated in the Show Cause Order that it would make the appendix public five days after the date of the order, Show Cause Order at 12, and note that defendant agreed not to release the appendix only upon approval of the Settlement Agreement. Settlement Agreement at 8. Plaintiffs argue that "[t]hese statements clearly reveal that FERC did not believe that the release of the [a]ppendix would undermine its ability to obtain such information in future investigations." Plaintiffs' Mot. at 11. In response, defendant states that "FERC's threatened disclosure has no legal significance [and][t]here is no way to know what would have happened had Williams and AES failed to respond to the Show Cause Order." Defendant's Reply at 4.

The Court finds defendant's argument unconvincing. Agreements for confidentiality, standing alone, are insufficient to satisfy the requirements needed for nondisclosure under Exemption 4. *GC Micro Corp.,* 33 F.3d at 1113 ("[W]hether the government has promised to keep the information confidential, is not dispositive under Exemption 4."); *see also Petkas v. Staats,* 501 F.2d 887, 889 (D.C.Cir.1974) ("Nor can a promise of confidentiality in and of itself defeat the right of disclosure."). If the Court were to accept defendant's argument, any agency could, theoretically, simply hand out promises of confidentiality to individuals who gave information in order to avoid judicial review as to whether a record can be withheld. FERC has failed to explain why it threatened Williams and AES with disclosure of the information now in question on the one hand, and continued to refuse disclosure of the same information to news reporters and, more importantly, the public, on the other. As FERC retains subpoena and investigatory power, even if disclosure of the appendix

were to cause individuals to decide not to voluntarily disclose information in the future, as defendant argues, the government would still be able to access the relevant information. Therefore, the Court finds that defendant has failed to meet its burden of justifying its withholding of the appendix under Exception 4.

## V. CONCLUSION

Because defendant has failed to demonstrate that the appendix is exempt from disclosure, defendant's motion for summary judgment is DENIED. Plaintiffs' motion for summary judgment is GRANTED.

IT IS SO ORDERED.

### JUDGMENT

Pursuant to the Court's order dated September 13, 2002, denying defendant's motion for summary judgment and granting plaintiffs' motion for summary judgment, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiffs shall have judgment against defendant, each side to bear its own attorneys' fees and costs.

IT IS SO ORDERED.